# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
_____

No. 22-1394

## CLARE E. MUNDELL,

**Plaintiff – Appellee,**

v.

## ACADIA HOSPITAL CORP.,

**Defendant – Appellant,**

## EASTERN MAINE HEALTHCARE SYSTEMS,

**Defendant.**
_____

**On Appeal from the United States District Court, District of Maine**

_____

## BRIEF OF APPELLANT ACADIA HOSPITAL CORP.

_____

Melissa A. Hewey, First Circuit Bar No. 40774
Kasia S. Park, First Circuit Bar No. 1173974
*Attorneys for Acadia Hospital Corp.*

DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com
kpark@dwmlaw.com

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
_____

No. 22-1394

## CLARE E. MUNDELL,

### Plaintiff – Appellee,

### v.

## ACADIA HOSPITAL CORP.,

### Defendant – Appellant,

## EASTERN MAINE HEALTHCARE SYSTEMS,

### Defendant.
_____

### On Appeal from the United States District Court, District of Maine

_____

## BRIEF OF APPELLANT ACADIA HOSPITAL CORP.

_____

Melissa A. Hewey, First Circuit Bar No. 40774
Kasia S. Park, First Circuit Bar No. 1173974
*Attorneys for Acadia Hospital Corp.*

DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com
kpark@dwmlaw.com

# <u>DISCLOSURE STATEMENT</u>

Defendant/Appellant Acadia Hospital Corporation ("Acadia") is a Maine nonprofit public benefit corporation.  Acadia's sole member is Eastern Maine Healthcare Systems (doing business as Northern Light Health).  As a nonprofit public benefit corporation, Acadia has no shareholders.  Eastern Maine Healthcare Systems, doing business as Northern Light Health, is a nonprofit public benefit corporation.  It has no parent corporation, nor does it have any shareholders.

DISCLOSURE STATEMENT ...................................................i

TABLE OF CONTENTS ....................................................... ii

TABLE OF AUTHORITIES ..................................................iv

JURISDICTIONAL STATEMENT ....................................... 1

STATEMENT OF THE ISSUES...............................................2

STATEMENT OF THE CASE ..................................................3

    I.  Statement of the Facts......................................................3

    II. Procedural History ..........................................................5

SUMMARY OF THE ARGUMENT ....................................7

STANDARD OF REVIEW ......................................................9

ARGUMENT .......................................................................10

    I.      The District Court Erred by Holding That The Maine Equal Pay
         Law Imposes Strict Liability .................................................10

    II.     The District Court Erred in Holding That Any Violation of the
         Maine Equal Pay Law Subjects The Employer to Treble
         Damages And Attorneys' Fees.................................................18

        A.     Neither the Plain Language of the Statute Nor Law Court
              Precedent Supports the District Court's Decision................19

        B.     The District Court's Decision is Inconsistent with the Purpose
              of the MEPL .......................................................................22

        C.     The District Court's Construction of the Statute Would
              Produce an Absurd Result ...................................................25

III.   If There Remains Uncertainty, the Court Should Certify the
       Question Regarding the Proper Construction of the MEPL to the
       Law Court ................................................................................................ 27

CONCLUSION ................................................................................................ 31

CERTIFICATE OF COMPLIANCE ................................................................ 32

CERTIFICATE OF SERVICE ......................................................................... 33

ADDENDUM ................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*20 Thames St. LLC v. Ocean State Job Lot of Me. 2017, LLC*, 2020 ME 55, 231 A.2d 426 ................................................................................................ 25

*Barton v. Clancy*, 632 F.3d 9 (1st Cir. 2011) .............................................. 10, 11

*Beckwith v. United Parcel Service, Inc.,* 889 F.2d 344 (1st Cir. 1983) ............. 26

*Benson v. Wal-Mart Stores E., L.P*, 14 F.4th 13 (1st Cir. 2021) ........................ 9

*Brady v. Cumberland County*, 2015 ME 143, 126 A.3d 1145 .......................... 14

*Burke v. Port Resort Realty Corp.,* 1999 ME 138, 737 A.2d 1055 ............. 20, 29

*Coffey v. New Hampshire Jud. Ret. Plan*, 957 F.3d 45 (1st Cir. 2020) ............. 11

*Cooper v. Springfield Terminal Railway Co.*, 635 A.2d 952 (Me. 1993) ... 21, 29

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) .................................. 14

*Good v. Altria Group, Inc.*, 624 F. Supp. 2d 132 (D. Me. 2009) ...................... 28

*Grant v. City of Saco*, 436 A.2d 403 (Me. 1981) ............................................. 20

*Hegarty v. Somerset County*, 53 F.3d 1367 (1st Cir. 1995) ................................ 9

*In re Wage Payment Litig.*, 2000 ME 162, 759 A.2d 217 ............... 23, 24, 26, 29

*Int'l Paper Co. v. Bd. of Envtl. Protection,* 629 A.2d 597 (Me. 1993) ............. 23

*Johnson v. Spencer Press of Maine, Inc.,* 364 F.3d 368 (1st Cir. 2004) ........... 22

*Kehoe v. Thornton Academy*, No. CV-16-0200 (Me. Super. Ct., Yor. Cty. June 19, 2017) ..................................................................... 29

*Ken's Foods, Inc. v. Steadfast Ins. Co.*, 36 F.4th 37 (1st Cir. 2022) ..... 28, 29, 30

*Lehman Bros. v. Schein,* 416 U.S. 386 (1974) .................................................. 28

*Liberty Mut. Ins. Co. v. Com. Union Ins. Co.,* 978 F.2d 750 (1st Cir. 1992) ...... 9

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................... 14

*N. River Ins. Co. v. Snyder*, 2002 ME 146, 804 A.2d 399 ................................ 28

*Purdy v. Community Telecommunications Corp.,* 663 A.2d 25 (Me. 1995) ..... 21

*Reagan v. Racal Mortg., Inc.*, 1998 ME 188, 715 A.2d 925 ............................ 11

*Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133 (2000) ...................... 9

*Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, 157 A.3d 223 ......... 13, 14

*State v. Chittim*, 775 A.2d 381 (Me. 2001) ..................................................... 12

*Strickland v. Comm'r, Me. Dep't of Hum. Servs.,* 96 F.3d 542 (1st Cir. 1996) ... 9

*Town of Eagle Lake v. Comm'r, Dept. of Educ.,* 818 A.2d 1034 (Me. 2003) ... 23

*Town of Madison v. Town of Norridgewock,* 544 A.2d 317 (Me. 1988) ........... 23

*United States v. Gifford,* 17 F.3d 462 (1st Cir.1994) ........................................ 9

*U.S. Steel v. M. DeMatteo Const. Co.,* 315 F.3d 43 (1st Cir. 2002) ................. 28

*Winston v. Maine Tech. Coll. Sys.*, 631 A.2d 70 (Me. 1993) ........................... 15

## STATUTES

8 U.S.C. § 1367(a) ........................................................................1

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

29 U.S.C. § 206(d)(1).................................................................. 13

42 U.S.C. §§ 2000e *et seq.*..........................................................1

4 M.R.S. § 57 .............................................................................. 28

5 M.R.S. §§ 4551-4634 .................................................................5

26 M.R.S. § 626-A ............................................................... passim

26 M.R.S. § 628 ................................................................... passim

26 M.R.S. § 629 ................................................................... passim

26 M.R.S. § 781 .......................................................................... 13

26 M.R.S. §§ 831-840 ...................................................................5

26 M.R.S. § 833 .......................................................................... 22

## RULES AND REGULATIONS

Fed. R. App. P. 4 ...........................................................................2

Fed. R. Civ. P. 56 ..........................................................................9

M.R. App. P. 25 ........................................................................... 28

12-170 C.M.R. ch. 12, §§ I-V .......................................... 15, 24, 25

# SECONDARY MATERIALS

Casey Lancaster, *Policy Options for Recruiting and Retaining Rural Primary Care Physicians in Maine* (2015) Muskie School Capstones and Dissertations, https://digitalcommons.usm.maine.edu/muskie_capstones/121/ ................................................................................................................ 16

Charles S. Colgan, *Maine's Aging Economy and the Economy of Aging*, Blane House Conference on Aging (September 2006), http://muskie.usm.maine.edu/Publications/MaineAgingEconomy.pdf ................................................................................................................ 16

*Governor Mills Announces New Maine Jobs & Recovery Plan Initiatives to Strengthen Maine's Health Care Workforce In Face of COVID-19 Pandemic* (October 25, 2021) https://www.maine.gov/governor/mills/news/governor-mills-announces-new-maine-jobs-recovery-plan-initiatives-strengthen-maines-health ...................... 17

James McKenna, *The Law Court's Philosophy of Statutory Interpretation the Legislature As Architect, the Court As Builder*, 19 Me. B.J. 164 (2004) ......... 12

*MAINE 2025: An exploration of the future workforce requirements for the Maine State Government* (March 2015) MaineWorkforce2025.pdf ............................ 16

Me. Dept. Health and Human Services, *Recruitment and Retention Toolkit*, https://www.maine.gov/dhhs/recruitment-and-retention-toolkit (last visited August 19, 2022) ....................................................................................................... 17

Me. Dept. of Labor, Bureau of Labor Standards, Wage and Hour Division, *Equal Pay Self-Audit Checklist for Employers*, www.maine.gov/labor/labor_laws/publications/epaudit.pdf (last visited August 22, 2022) ................................................................................................................ 15

# JURISDICTIONAL STATEMENT

This appeal involves an important question of Maine law arising out of the Order of the United States District Court for the District of Maine granting Plaintiff/Appellee Clare Mundell's partial motion for summary judgment and denying Defendant/Appellant Acadia's Motion for Certification of Question of State Law to the Maine Supreme Judicial Court ("the Law Court"). In her Complaint, Plaintiff asserted a claim for violation of the Maine Equal Pay Law, 26 M.R.S. § 628 (Count I) and claims of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. and comparable state laws (Counts II and III). The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

This Court has jurisdiction over this appeal from a final judgment of the District Court pursuant to 28 U.S.C. § 1291. The District Court's Order granting summary judgment to Plaintiff on Count I of her Complaint and denying Acadia's Motion for Certification of Question of Law was entered on February 8, 2022. On May 11, 2022, the parties filed a Joint Stipulation of Dismissal with Prejudice dismissing the remaining counts (Counts II and III) of the Complaint.[1] On May 12, 2022, the District Court entered a final judgment for Plaintiff and against Acadia

---

[1] The parties further stipulated to the dismissal of Defendant Eastern Maine Healthcare Systems, which is not a party to the above-captioned appeal.

on Count I in the amount of $180,955.90 and a judgment of dismissal as to Counts II and III. (Add. 25). The final judgment disposed of all of Plaintiff's claims. In accordance with Fed. R. App. P. 4(a)(1)(A), Acadia filed a timely Notice of Appeal on May 17, 2022.

## STATEMENT OF ISSUES

1. Whether the District Court erred in holding that the Maine Equal Pay Law requires, without exception, that the wages of all employees be equal for comparable work in all instances except where any difference is based on an established seniority or merit increase system or differences in shift or time of day worked, and that any other differences, even if justifiable for reasons other than sex, violate the law.

2. Whether the District Court erred in ruling that violation of the Maine Equal Pay Law subjects the employer to treble damages and attorneys' fees.

3. Whether this Court should certify the important question of law construing the Maine Equal Pay Law to the Law Court.

## STATEMENT OF THE CASE

## I.    STATEMENT OF THE FACTS

Acadia is a psychiatric hospital located in Bangor, Maine that provides both inpatient and outpatient care.  (A. 72, 81).[2]  In or around 2014, Anthony Ng, M.D., who was then the Chief Medical Officer at Acadia, decided that Acadia needed to make a determined effort to hire psychologists to assist with providing mental health services to its patients and he began this effort by recruiting Dr. DP, a local psychologist with an excellent reputation and connections both within Acadia and also within the broader community.  (A. 72-73, 83).  After several months of negotiations, Dr. DP agreed to join the staff at Acadia if he was offered an acceptable salary.  (A. 73, 83).  Dr. Ng and Dr. DP negotiated a salary of $95 per hour, a rate that was acceptable to Dr. DP and also in line with Dr. Ng's judgment as to the value of his services at the time, including his experience, availability, reputation and longstanding work in the community.  (A. 73, 83). Approximately one year later, Dr. Ng hired a second psychologist, Dr. FK.  (A. 73, 83). Dr. FK's salary was set with reference to Dr. DP's salary at a rate of $90 per hour.  (A. 73, 84).

---

[2] Citations to the appendix will utilize the abbreviation of "A." followed by the page number.  Citations to the addendum will utilize the abbreviation of "Add." followed by the page number.

When Plaintiff was hired by Acadia in July 2017, approximately two years after Dr. FK was hired, Dr. Ng concluded, in consultation with Human Resources, that the market rate for her services was $50 per hour. (A. 74, 84). This calculation took into account such factors as Acadia's need for the services she would be performing, her prior work experience, the extent of her availability, and similar factors. (A. 74, 84). Plaintiff's rate of pay was established solely with reference to the market rate for her services as a pool psychologist and her sex had nothing to do with it. (A. 74).

In early 2019, while hospital management was conducting a hospital-wide review of employee compensation at Acadia, some discrepancies between the salaries of men and women in similar positions were discovered, but these discrepancies were not ascribed to gender since in some cases women were compensated at higher levels than their male counterparts and vice versa. (A. 74). Among the discrepancies in compensation that were discovered was the disparity between pay levels of the pool psychologists. (A. 74, 87). Once this disparity was discovered, Acadia worked to correct it by eliminating the disparity and bringing all of the psychologists' salaries as close to market level as the circumstances permitted. (A. 74).

## II.    PROCEDURAL HISTORY

On January 5, 2021, Plaintiff filed a three-count complaint against Acadia and Eastern Maine Healthcare Systems alleging a violation of the Maine Equal Pay Law ("MEPL") (Count I); sex discrimination in violation of Title VII and the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634 (Count II); and retaliation in violation of Title VII, the Maine Human Rights Act, the Maine Whistleblower Protection Act, 26 M.R.S. §§ 831-840, and the MEPL (Count III). (A. 22-23). Plaintiff did not allege a claim for violation of the federal Equal Pay Act.   On September 1, 2021, Plaintiff moved for partial summary judgment on the MEPL claim (Count I) only and Acadia opposed the motion.   (A. 3). In the course of briefing Plaintiff's Motion for Partial Summary Judgment, the parties set forth competing interpretations of the MEPL, as well as the penalty provision in 26 M.R.S. § 626-A. *Compare* (Pl.'s Mot. for Summ. J., ECF No. 13, at 3-9; Pl.'s Reply, ECF No. 19, at 6-13,) *with* (Defs.' Opp., ECF No. 15, at 11-17.)

On January 11, 2022, the District Court held oral argument on Plaintiff's Motion for Partial Summary Judgment, at which point Judge Walker raised the issue of whether the Court should certify the question of interpreting the MEPL to the Law Court, since there was no controlling precedent. (A. 101, 127-128). On January 12, 2022, in response to the District Court's questioning at oral argument

and before a decision on summary judgment was rendered, Acadia filed a Motion for Certification of Question of State Law to the Law Court. (A. 4).

On February 8, 2022, the District Court issued an Order granting Plaintiff's Motion for Partial Summary Judgment and denying Defendants' Motion for Certification. (Add. 1-22). On April 29, 2022, the parties filed a Stipulation on Remedies. (A. 134). On May 2, 2022, Plaintiff filed a Motion for Order on Damages Owing to Plaintiff on Count I of her Complaint and sought judgment in the amount of $180,955.90, which the District Court granted, over Acadia's objection, on May 9, 2022. (A. 5). On May 9, 2022, Acadia filed a motion for reconsideration seeking a correction of the District Court's Order on Damages. (A. 6). On May 10, 2022, the District Court issued an Amended Order on Damages, granting Plaintiff's Motion for Order on Damages over Acadia's objections as set forth in the summary judgment pleadings. (Add. 23).

On May 11, 2022, the parties filed a Joint Stipulation of Dismissal with Prejudice dismissing Counts II and III of the Complaint as to Acadia and the dismissal of all claims against Defendant Eastern Maine Healthcare Systems. (A. 137). The Stipulation of Dismissal dismissed all the federal claims with prejudice. *Id.* On May 12, 2022, the District Court entered judgment against Acadia and in favor of Plaintiff in the amount of $180,955.90 on Count I and entered a judgment of dismissal as to Counts II and II against Acadia and all counts against Eastern

Maine Healthcare Systems. (Add. 25). This judgment was a final judgment and disposed of all of Plaintiff's claims.

Acadia filed a timely Notice of Appeal on May 17, 2022. On June 16, 2022, Acadia filed a motion requesting that this Court certify the question regarding the interpretation of the MEPL to the Law Court. On July 18, 2022, Acadia's Motion to Certify Question to the Law Court was denied without prejudice to reconsideration by the panel that will decide the merits of this appeal.

## SUMMARY OF THE ARGUMENT

In this case, the United States District Court for the District of Maine entered judgment in favor of Plaintiff-Appellee Claire Mundell for treble damages and attorneys' fees on her claim brought under the Maine Equal Pay Law, 26 M.R.S. § 628, notwithstanding that Plaintiff's claim for intentional discrimination was dismissed with prejudice, and the summary judgment record clearly demonstrated that the pay differential between Plaintiff and her male colleagues was because of legitimate nondiscriminatory reasons not connected in any way with Plaintiff's sex. In refusing to consider Acadia's good faith non-discriminatory reasons, the District Court thus construed the MEPL to be a law of strict liability that requires all employees in Maine to be paid the same amount for similar job classifications except if the differential is due to a merit pay, a seniority system or a shift differential.

The District Court's construction of the statute is erroneous. If upheld, it would have devastating effects on the State of Maine because, among other things, it would stifle economic prosperity by making effective recruitment and retention of a talented, diverse workforce to the State, and most particularly to its rural areas, impossible. The District Court committed error in its textual analysis of the MEPL by reading out of the statute the words "discriminate" and "on the basis of sex," and it failed to construe the MEPL in harmony with the entire statutory scheme. Further, the District Court erroneously relied on federal precedent construing the Federal Equal Pay Act and ignored relevant decisions of Maine's highest court suggesting that it would not follow federal precedent in construing the MEPL given the substantial differences between the language in the two statutes.

The District Court committed further error in holding that the liquidated damage provision contained in 26 M.R.S. § 626-A applies to violations of the MEPL. The Maine Law Court has never so held and such a holding is not supported by Law Court precedent or the regulations of the Maine Bureau of Labor Standards, the state agency charged with enforcement of the MEPL. Nor is it consistent with the intent of the statute as can be discerned from the plain language of the statutory scheme read as a whole

Finally because this is a novel issue of Maine law involving a statute unique to the State of Maine, in the event there is any uncertainty, this Court should certify the question of construction of the MEPL and application of Maine's statutory penalty provision to the Maine Supreme Judicial Court sitting as the Law Court for definitive guidance on these issues by Maine's highest court.

## STANDARD OF REVIEW

This Court reviews an order granting summary judgment *de novo*. *Benson v. Wal-Mart Stores E., L.P*, 14 F.4th 13, 17–18 (1st Cir. 2021). Summary judgment is appropriate only when all reasonable inferences are drawn in favor of Acadia and the record, construed in the light most favorable to Acadia, presents no genuine issue of material fact and demonstrates that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Hegarty v. Somerset County*, 53 F.3d 1367, 1372 (1st Cir. 1995) (reviewing summary judgment order *de novo* under "identical criteria governing district court[.]"); *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 151 (2000) (noting that under Rule 56, "the court should review the record as a whole"). The interpretation of a statute or regulation presents a purely legal question, which is subject to *de novo* review. *Strickland v. Comm'r, Maine Dep't of Hum. Servs.,* 96 F.3d 542, 545 (1st Cir. 1996); s*ee also United States v. Gifford,* 17 F.3d 462, 472 (1st Cir.1994); *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 757 (1st Cir. 1992).

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY HOLDING THAT THE MAINE EQUAL PAY LAW IMPOSES STRICT LIABILITY

The principal legal issue presented by this case is the interpretation of MEPL and whether that statute imposes strict liability on employers who pay comparably qualified employees of the opposite sex different wages. The MEPL provides, in relevant part:

> An employer may not discriminate between employees in the same establishment on the basis of sex by paying wages to any employee in any occupation in this State at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable work on jobs that have comparable requirements relating to skill, effort and responsibility. Differentials that are paid pursuant to established seniority systems or merit increase systems or difference in the shift or time of the day worked that do not discriminate on the basis of sex are not within this prohibition.

26 M.R.S. § 628. The District Court held that there was no requirement of discriminatory intent and that unless the employer falls within the three exceptions enumerated by the statute, any difference in pay between employees of the opposite gender is per se sex discrimination in violation of MEPL. (Add. 6). In reaching this conclusion, the District Court misconstrued the plain language of the statute and ignored fundamental rules of statutory construction.

A federal court exercising supplemental jurisdiction over a state law claim, such as the case here, must apply state substantive law. *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011). As the District Court acknowledged, Maine's highest court

has never had the occasion to interpret the MEPL. (Add. 6.) As a result, it is necessary to look to "the relevant statutory language, analogous decisions of the state supreme court, decisions of the lower state courts, and other reliable sources of authority," *Barton*, 632 F.3d at 17, and employ Maine "interpretive methods and canons of construction," *Coffey v. New Hampshire Jud. Ret. Plan*, 957 F.3d 45, 54, n.3 (1st Cir. 2020).

When Maine courts interpret a statute, they "first look at the plain meaning of the statutory language, seeking to give effect to legislative intent, and consider the particular language in the context of the whole statutory scheme." *Reagan v. Racal Mortg., Inc.*, 1998 ME 188, ¶ 7, 715 A.2d 925, 927. Significantly, the language of statutes should be construed "to reach a harmonious result and to avoid absurd, illogical, or inconsistent results." *Id.* Here, the District Court ignored these principals and instead stretched the meaning of the MEPL to essentially impose strict liability on employers, something not contemplated by the plain language or Maine's statutory scheme.

First, the District Court's interpretation of the MEPL reads the words "discriminate . . . on the basis of sex" out of the statute by holding that any reason for a pay differential that is not based on seniority, a merit increase system, or a shift differential is a violation of the statute. Thus, according to the District

Court's reasoning, an employer who pays employees different rates of pay on the basis of their geographic assignments, their ability to generate business, their willingness to relocate, or any number of legitimate business reasons, is deemed to have discriminated against the lower paid employee simply because the two employees happen to be of different sexes.

This construction of the MEPL would create the illogical result of permitting an employer with a single sex workforce to make judgments about pay differentials among employees based on factors other than a merit or seniority system or shift differential, while those with employees of both sexes could not. In short, the consequence of the District Court's interpretation is to remove "on the basis of sex" from the plain text of the statute. *See State v. Chittim*, 775 A.2d 381, 383 (Me. 2001) (recognizing that a statute must be construed in light of "the consequences of a particular interpretation."); *see also* James McKenna, T*he Law Court's Philosophy of Statutory Interpretation the Legislature As Architect, the Court As Builder*, 19 Me. B.J. 164, 168–69 (2004) ("The Maine Law Court considers itself a faithful agent of the legislature, at least up to a point. And that point is when the consequences of a plain-language decision (or even a[n] intent or general purpose decision) will result in consequences that seem seriously ill advised."). The plain meaning of "on the basis of" is "because," and in this case, there was simply no evidence at all that Plaintiff was paid less than Drs. DP and FK because of her sex.

Second, the District Court failed to consider the MEPL in the context of the whole statutory scheme. Chapter 7 of Title 26 governs Employment Practices in the State of Maine.  If the Maine legislature had intended for the MEPL to impose strict liability upon an employer, then it would have expressed that, either by specifying that the three enumerated exceptions were the only ways to justify a pay disparity or by explicitly stating that it was a strict liability statute as it did in 26 M.R.S. § 781, another provision in Chapter 7.

Third, the District Court erred by relying on the Supreme Court's interpretation of the Federal Equal Pay Act ("FEPA") to find that there is no discriminatory intent requirement under the MEPL. The Maine Law Court has made it clear that it will only consider the construction of a federal counterpart "when the federal and state laws are substantially identical." *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 26, 157 A.3d 223. Here, there are significant differences between the language of the MEPL and the FEPA, which strongly suggests that the Law Court would not look to precedent interpreting the federal counterpart.

For example, the MEPL refers to "*comparable* work on jobs that have *comparable* requirements relating to skill, effort and responsibility[,]" 26 M.R.S. § 628 (emphasis added), whereas the FEPA refers to "*equal* work on jobs the performance of which requires *equal* skill, effort, and responsibility." 29 U.S.C. §

206(d)(1) (emphasis added). Another important difference between the language of the MEPL and that of the FEPA is that the enumerated exceptions are different, with the FEPA containing a catch-all exception for a differential based on "any other factor other than sex[.]" 29 U.S.C. § 206(d)(1).

Despite these significant differences in the statutory language, the District Court relied on federal case law interpreting the FEPA and ignored relevant decisions of Maine's highest court suggesting that it would not follow federal precedent in construing the law. *See Scamman*, 2017 ME 41, ¶ 26. While claims under the FEPA are subject to a burden-shifting analysis, which does not include a requirement that the defendant was motivated by discriminatory animus, *see Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974), the District Court assumed without explanation that the Law Court would apply that same standard to the MEPL. This is particularly troubling given the substantial differences between the statutory language and the Law Court's demonstrated willingness to reject the federal court's burden shifting analysis in other contexts. *See, e.g. Brady v. Cumberland County*, 2015 ME 143, ¶¶ 36-39, 126 A.3d 1145 (holding that three-step burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) does not apply at the summary judgment stage for claims arising under Maine's Whistleblowers' Protection Act).

Another problem with the District Court's decision is that its interpretation of the MEPL, which reads as a form of strict liability (Add. 10), conflicts with Maine state policy as reflected in the Maine Department of Labor, Bureau of Labor Standards Rules designed to enforce the MEPL. *See* 12-170 C.M.R. ch. 12, §§ I-V (Add. 26-32). In interpreting statutory language, the Law Court has looked to supplemental guidance from the executive agency charged with enforcement of the law. *See, e.g. Winston v. Maine Tech. Coll. Sys.*, 631 A.2d 70, 74 (Me. 1993) (reviewing the Maine Human Rights Commission's regulations for defined terms when considering whether certain disorders satisfied the statutory definition of a disabled individual). Here, the Bureau's Rules explicitly allow employers a presumption of compliance upon completion of a self-audit program. Add. 30-32. In other words, if employers are working toward compliance, the Rules provide employers a presumption that they are not discriminating on the basis of sex, even with an identified disparity in pay.  By definition then, the Bureau's Rules do not contemplate strict liability under the MEPL.  In fact, the Bureau's Self-Audit Checklist simply cautions employers to make sure that any disparities in pay are due to "legitimate reasons." Me. Dept. of Labor, Bureau of Labor Standards, Wage and Hour Division, *Equal Pay Self-Audit Checklist for Employers available at* www.maine.gov/labor/labor_laws/publications/epaudit.pdf.   Accordingly, the

Bureau's Rules only further undermine the District Court's interpretation of the MEPL.

Finally, the District Court's interpretation of the MEPL is directly at odds with the longstanding recognition in Maine of the need to attract and retain a talented and highly skilled workforce. For decades, politicians and policy makers in the State of Maine have been wrestling with such issues as how to replace Maine's aging work force with new and vibrant talent, how to attract skilled workers – including healthcare workers – to Maine's rural communities, and how to diversify Maine's workforce. *See, e.g.* Charles S. Colgan, *Maine's Aging Economy and the Economy of Aging* (September 2006), http://muskie.usm.maine.edu/Publications/MaineAgingEconomy.pdf ("A distinguishing feature of Maine is that growth in the population 65 and older will substantially exceed growth in total population in Maine from 2000-2030."); MAINE 2025: *An exploration of the future workforce requirements for the Maine State Government* (March 2015), MaineWorkforce2025.pdf; Casey Lancaster, *Policy Options for Recruiting and Retaining Rural Primary Care Physicians in Maine* (2015) Muskie School Capstones and Dissertations https://digitalcommons.usm.maine.edu/muskie_capstones/121/.

The pandemic has only exacerbated these issues, particularly in the health care industry. *See, e.g. Governor Mills Announces New Maine Jobs & Recovery*

*Plan Initiatives to Strengthen Maine's Health Care Workforce In Face of COVID-19 Pandemic* (October 25, 2021)

https://www.maine.gov/governor/mills/news/governor-mills-announces-new-maine-jobs-recovery-plan-initiatives-strengthen-maines-health ("Maine continues to battle the COVID-19 pandemic, which is exacerbating Maine's longstanding workforce challenges in the health care sector. The health care sector has been one of the hardest hit during the pandemic, representing 12 percent of net job losses in Maine."); *see also* Me. Dept. Health and Human Services, *Recruitment and Retention Toolkit, available at* https://www.maine.gov/dhhs/recruitment-and-retention-toolkit (last visited August 18, 2022) (providing resources for health care, behavioral health, and long-term service providers for recruiting and retaining workers).

It is axiomatic that in order to address these troubling concerns, Maine employers need to be free to recruit talented individuals to the state and retain them when they come.  Recruitment, however, requires flexibility and that is exactly what the MEPL, as interpreted by the District Court, would prevent.  Thus, for example, a hospital  would be prohibited from offering a skilled physician additional compensation or other benefits to live and work in Northern Maine because doing so would result in that person (whatever their sex) being paid more than a physician of the opposite sex in Bangor, Pittsfield, Waterville, Brunswick or

Portland. Similarly, a business, trying to diversify its workforce would be prohibited from offering a person of color additional compensation to relocate to Maine and join its staff because that too would result in that person being paid more than existing employees of the opposite sex. This, of course, is not the result the Maine Legislature intended when it enacted the MEPL and it is not the construction that the Maine Law Court would likely give to the statute. Maine employers need flexibility in setting compensation – when that flexibility is based on nondiscriminatory reasons – in order for the state to thrive and there is nothing in the MEPL that prohibits that.

In sum, the District Court erred in granting Plaintiff summary judgment and ruling that the MEPL requires, without exception, that the wages of all employees in a similar job classification be equal except where the difference is based on an established seniority or merit increase system or difference in shift or time of day worked, and that any other differences, even if they are unquestionably because of factors other than sex, violate the law.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT ANY VIOLATION OF THE MAINE EQUAL PAY LAW SUBJECTS THE EMPLOYER TO TREBLE DAMAGES AND ATTORNEYS' FEES.

Having erroneously held that Maine employers are strictly liable if they allow (even inadvertently) employees in like job classifications to receive different rates of pay for reasons other than merit pay, seniority or shift differential, the

District Court compounded its error by further concluding that a violation of the MEPL subjects the employer to liability for treble damages and attorneys' fees under 26 M.R.S. § 626-A. As the District Court itself conceded, this holding is not clear on the face of the statute. (Add. 19). It is also not supported by any case decided by the Maine Law Court. And it is not consistent with the purpose of the MEPL as made clear from the plain language of the law. The District Court's ruling was an error of law and should be reversed.

### A. Neither the Plain Language of the Statute Nor Law Court Precedent Supports the District Court's Decision.

Entitled "Penalties," 26 M.R.S. § 626-A provided, during the period relevant to this case:[3]

> Whoever violates any of the provisions of sections 621-A to 623 or section 626, 628, 628-A, 629 or 629-B is subject to a forfeiture of not less than $100 nor more than $500 for each violation.
>
> Any employer is liable to the employee or employees for the amount of unpaid wages and health benefits. Upon a judgment being rendered in favor of any employee or employees, in any action brought to recover unpaid wages or health benefits under this subchapter, such judgment includes, in addition to the unpaid wages or health benefits adjudged to be due, a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages.

---

[3] The statute was amended in 2021, after Plaintiff left employment with Acadia, to include Section 600-A in the list of sections the violation of which are subject to forfeiture.

Section 626-A contains two separate provisions relating to "penalties" for violation of various sections contained in Subchapter Two of Chapter 7 of Title 26 Maine Revised Statutes (Employment Practices). The first provision, contained in the first paragraph of the statute, applies to eight enumerated sections of Subchapter Two and provides for a forfeiture in the event of a violation of any of the enumerated provisions. The second paragraph of Section 626-A, as the court below correctly observed (Add. 19), applies only to claims for "unpaid wages" under the provisions of Subchapter Two and provides for an award of treble damages and attorney's fees.

In Subchapter Two there are four provisions that require payment of wages by an employer: Section 621-A which requires timely and full payment of wages; Section 625-B which requires payment of severance pay in certain circumstances; Section 626 which requires payment in full upon cessation of employment; and Section 629 which prohibits employers from requiring employees to work without pay. Section 625-B includes its own remedies provision, and the Maine Law Court has stated that the liquidated damages portion of Section 626-A applies to the other three provisions. *See Grant v. City of Saco*, 436 A.2d 403, 404–405 (Me. 1981) ("Section 626-A allows an employee to bring an action for violation of section 621 and if successful, receive a judgment for the amount of unpaid wages, liquidated damages of twice that amount, and attorney's fees"); *Burke v. Port Resort Realty*

*Corp.,* 1999 ME 138, 737 A.2d 1055 (affirming judgment for treble damages and fees on claim for commissions under Section 626); *Purdy v. Community Telecommunications Corp.,* 663 A.2d 25 (Me. 1995) (same); *Cooper v. Springfield Terminal Railway Co.*, 635 A.2d 952 (Me. 1993) (holding that a claim for unpaid training time under Section 629 is subject to liquidated damage provision of Section 626-A). The Law Court, however, has never held that any provision in Subchapter Two that does not specifically address payment of wages is subject to the liquidated damages provision.

The difference between cases brought under Sections 621, 626 and 629, where the Law Court has held that liquidated damages are available, and cases brought under the MEPL, is that whereas Sections 621, 626 and 629 specifically require the employer to pay wages, the MEPL does not. Rather, the MEPL prohibits employers from discriminating against their employees and requires that the Department of Labor monitor the State's progress toward achieving pay equality across the work force. This difference is important because there is a critical distinction between the unpaid wages for work performed by an employee and relief recoverable by an employee in a successful discrimination claim. An employee who works and is not paid as agreed is entitled to wages as required under Sections 621, 626 and 629. An employee who is subjected to discrimination, on the other hand, is entitled to damages, one element of which is

often back pay. *See, e.g. Johnson v. Spencer Press of Maine, Inc.,* 364 F.3d 368, 379 (1st Cir. 2004). That employee is not entitled to pursue a claim for failure to pay wages in lieu of (or in addition to) pursuing a claim for discrimination. Thus, for example, an employee who is suspended because of whistleblowing activity in violation of Maine's Whistleblower Protection Act, 26 M.R.S. § 833, is entitled to seek compensation for the employer's wrongful discrimination through a claim under the Whistleblower Protection Act and, if successful, to recover lost wages as a measure of damages as well as possible injunctive relief prohibiting future discrimination. That employee is not, however, entitled to bring a claim under 26 M.R.S. § 629 for unpaid wages and instead collect liquidated damages on the claim.

In this case, there is no contention that Acadia did not pay Plaintiff what it had agreed to pay her throughout her tenure. Rather, Plaintiff's claim is that she was discriminated against in her compensation in violation of the MEPL. Her recovery is thus not for wages but rather for damages. The liquidated damages provision of Section 626-A therefore does not apply in this case and the District Court's holding to the contrary should be reversed.

**B.     The District Court's Decision is Inconsistent with the Purpose of the MEPL.**

The District Court's conclusion that the liquidated damages provision in Section 626-A applies to the MEPL was based on the Court's conclusion that what

the Maine Law Court has characterized as "the not insignificant civil forfeiture penalties that can be brought by the Attorney General," *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16, 759 A.2d 217, are, in fact, not substantial enough and treble damages and attorneys' fees are necessary to deter violation of the wage laws. (Add. 21). This conclusion is erroneous because it is inconsistent with the purpose of the MEPL.

Under established Maine law, the primary goal of statutory construction is "to give effect to the Legislature's intent." *Town of Eagle Lake v. Commissioner, Dept. of Educ.,* 818 A.2d 1034, 1037 (Me. 2003). This is accomplished by determining "from the plain language[,] the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable or illogical." *International. Paper Co. v. Board of Envtl. Protection,* 629 A.2d 597, 599-600 (Me. 1993). Further, the language of the statute "must be given meaning consistent with the overall statutory context and must be construed in the light of the subject matter, the purpose or the statute and the consequences of a particular interpretation." *Town of Madison v. Town of Norridgewock,* 544 A.2d 317, 319 (Me. 1988).

Using these tools of construction, it is clear that the purpose of the MEPL is to promote voluntary compliance in an effort to move the State of Maine into a position where members of both sexes are paid equally for comparable work.

Thus, the law requires that "the Department of Labor shall annually report to the joint standing committee of the Legislature having jurisdiction over labor matters on the progress of the State to comply with this section," clearly reflecting the Maine Legislature's understanding that achieving such equality was a process that would take time.  26 M.R.S.A. § 628.

Not only do the words of the statute reflect the voluntary compliance aspect of this law, but so too do the Bureau's Rules Relating to Equal Pay.  *See In re Wage Payment Litig.*, 2000 ME 162, ¶ 10, 759 A.2d 217 (observing that "our interpretation [of Section 626-A] is in harmony with that of the Department of Labor"); *see generally* 12-170 C.M.R. ch. 12, §§ I-V (Add. 26-32). The Rules establish a process through which a person who believes that they have been discriminated against in violation of MEPL may file a complaint with the Bureau. *Id.* § III(A).  If the Bureau determines that the complaint states a claim upon which relief may be granted, the Bureau is required to conduct an investigation, which may include gathering evidence and holding fact-finding hearings.  *Id.* § III(B)-(D).  If, following the investigation, the Bureau finds reasonable cause to believe that discrimination has occurred under the MEPL and the Bureau's Rules, the Bureau may either "[s]eek a voluntary compliance agreement signed by the employer that eliminates the unlawful practice and provides appropriate relief to the aggrieved party," or "[r]efer the complaint to the Attorney General, informing

the Attorney General of the relevant facts and recommending the commencement of a civil enforcement action." *Id.* § III(F). Although the Rules do not define "appropriate relief," presumably, if the Bureau understood Section 626-A to provide for treble damages and attorney's fees, its Rules would cite to that provision to define "appropriate relief."

### C. The District Court's Construction of the Statute Would Produce an Absurd Result.

Finally, the District Court's interpretation of Section 626-A as permitting recovery of "unpaid wages" for a violation of Section 628 based on payment of unequal wages will lead to absurd and unreasonable results. *See 20 Thames St. LLC v. Ocean State Job Lot of Me. 2017, LLC*, 2020 ME 55, ¶ 8, 231 A.3d 426 (stating that, in construing statutes, courts "will avoid results that are absurd, inconsistent, unreasonable, or illogical" (alteration and quotation marks omitted)). In many employment situations, particularly those involving more than one job site, neither employer nor employee may realize that employees of different sexes are being paid unequal wages for years. If an employee was permitted to recover the difference between the wage they were paid and the wage that another employee of the opposite sex had been paid as "unpaid wages," plus double that amount as liquidated damages, the recovery would be financially devastating for the employer and provide a windfall to the employee.

Furthermore, such a result would elevate equal pay between the sexes over all other forms of employment discrimination – something that there is no indication that the Maine Legislature intended. For example, under federal and state discrimination laws, an employee subjected to race discrimination would only be entitled to recover actual lost wages – and that only after showing that the employer acted with discriminatory intent – whereas any time a man is unintentionally payed less than a woman or a woman is unintentionally paid less than a man for similarly classified  work not due to merit, seniority or shift differential, the undercompensated person would be entitled to collect three times the difference in wages even without showing intentional discrimination. Absent a specific indication that the Maine Legislature intended to provide such elevated protection for differences in pay between employees of different sexes, this Court should abstain from doing so.

In sum, the District Court erred in awarding Plaintiff "unpaid wages" plus "an additional amount equal to twice the amount of unpaid wages as liquidated damages" under 26 M.R.S. § 626-A because Plaintiff has been paid for the work she actually performed. The only monetary remedy potentially available "is the not insignificant civil forfeiture penalties that can be brought by the Attorney General." *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16, 759 A.2d 217; *see also Beckwith v. United Parcel Service, Inc.,* 889 F.2d 344, 351(1st Cir. 1983)

(recognizing that "employers are subject to the civil forfeiture penalty contained in the first paragraph of § 626–A, which should serve as some deterrent against truly unfair wage withholding agreements.")

## III. IF THERE REMAINS UNCERTAINTY, THE COURT SHOULD CERTIFY THE QUESTION REGARDING THE PROPER CONSTRUCTION OF THE MEPL TO THE LAW COURT.

Following oral argument on the motion for partial summary judgment where the District Court acknowledged that the Maine Law Court had never addressed these issues, Acadia immediately filed a motion requesting that the court certify the question to the Law Court. The District Court denied Acadia's motion to certify as part of its summary judgment order. Acadia subsequently filed a motion for certification with this Court. This Court denied the motion without prejudice to the panel deciding the merits considering the request. Although Acadia maintains that the above analysis should leave no reservation as to how this Court should rule, if there remains any uncertainty, Acadia requests that this Court certify the following question to the Law Court:

> Where an employer pays an employee at a rate less than another employee of the opposite sex who performs comparable work on a job with comparable requirements as to skill, effort, and responsibility for any reason other than an established seniority system, merit increase system, or difference in the shift or time of the day worked, does such conduct constitute a *per se* violation of the Maine Equal Pay Law, 26 M.R.S. § 628, entitling a plaintiff to recover treble damages and attorneys' fees pursuant to 26 M.R.S. § 626-A?

A federal court may certify a question to the Maine Law Court "[w]hen it appears . . . that there is involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court." 4 M.R.S. § 57; *see* M.R. App. P. 25(a). A Court of Appeals may certify a question "upon its own motion or upon request of any interested party." M.R. App. P. 25(a). This Court has observed that certification is "particularly appropriate" where the question at issue is novel and the law unsettled. *U.S. Steel v. M. DeMatteo Const. Co.,* 315 F.3d 43, 53–54 (1st Cir. 2002) (citing *Lehman Bros. v. Schein,* 416 U.S. 386, 391 (1974)). This Court has also recognized that certification is the "best path forward" where "answers to these questions may hinge on policy judgments best left to the [state's highest] court and will certainly have implications beyond these parties." *Ken's Foods, Inc. v. Steadfast Ins. Co.*, 36 F.4th 37, 44 (1st Cir. 2022) (citation omitted).

Certification is appropriate here because all requirements for certification as set forth by the Law Court and in the statute are satisfied and the balance of relevant factors weigh heavily in favor of certification. First, there are no disputes of material fact precluding the Law Court's review. *See Good v. Altria Group, Inc*., 624 F. Supp. 2d 132, 136 n.2 (D. Me. 2009) (citing *N. River Ins. Co. v. Snyder*, 2002 ME 146, ¶ 7, 804 A.2d 399, 401). As set forth in the Statement of Facts,

Acadia paid employees of opposite sex, performing comparable work different rates of pay. Acadia's justification for doing so did not fit within one of the three enumerated exceptions under the statute. Thus, the question the Law Court would be invited to address is a pure legal question.

Second, as the District Court acknowledged, there is no controlling case law or state law precedent. (Add. 6). The MEPL is referenced in only three Law Court decisions, none of which address or provide insight for resolving the questions at issue. *See In re Wage Payment Litig.*, 2000 ME 162, 759 A.2d 217 (interpreting 26 M.R.S. § 626-A); *Burke v. Port Resort Realty Corp.*, 1999 ME 138, 737 A.2d 1055 (interpreting 26 M.R.S. § 626); *Cooper v. Springfield Terminal Ry. Co.*, 635 A.2d 952 (Me. 1993) (interpreting 26 M.R.S.A. §§ 629, 626-A); *see also Kehoe v. Thornton Academy*, No. CV-16-0200, Order (Me. Super. Ct., Yor. Cty., June 19, 2017) (denying motion for judgment on the pleadings on claim brought pursuant to 26 M.R.S. § 628 on procedural grounds without discussion of the merits or application of substantive law).

Finally, the interpretation and application of the MEPL has significant implications for Maine employers that reach far beyond just the parties in this case. This Court has recently reiterated that certification is "especially appropriate" where the question presented "raises serious policy concerns" that will impact future cases. *Ken's Foods Inc.*, 36 F.4th at 45 (certifying question to state's highest

court where the question raised significant question of state law expected to arise in future cases) (citation omitted). The questions presented here will undoubtedly arise in future cases. The extent of potential employer liability under the MEPL is an issue of critical importance to Maine employers who must set wages for their employees in compliance with the MEPL but may (as happened here) have reasons other than those enumerated in the statute for differentiation. For example, it is reasonable to imagine that wages for comparable work may vary, without regard to sex, as a result of location, cost of living, and the employment market at place and/or time of hire. Under the District Court's Order, however, an employer in Maine with locations in Portland and Calais, for example, cannot pay its employees different fair market wages in consideration of any of those non-discriminatory criteria; instead, it must pay its employees who work at comparable jobs the same, regardless of location, employment market, cost of living, or date of hire.

The uncertainty on this important question of Maine law and Maine state policy demonstrates that "certification is the best path forward." *Ken's Foods Inc.*, 36 F.4[th] at 44. Based on the foregoing reasons as set forth fully in its Motion for Certification filed with this Court on June 16, 2022, which is incorporated herein by reference, Acadia requests that the Court certify the above question to the Law Court.

## CONCLUSION

For the foregoing reasons, the District Court's order granting Plaintiff summary judgment on her MEPL claim pled in Count I of the Complaint should be vacated, and this case should be remanded to the District Court for further proceedings. Alternatively, the question set forth above should be certified to the Maine Supreme Judicial Court sitting as the Law Court.

Dated: August 22, 2022

*/s/ Melissa A. Hewey*
Melissa A. Hewey
(First Circuit Bar No. 40774)

*/s/ Kasia S. Park*
Kasia S. Park
(First Circuit Bar No. 1173974)

Attorneys for Appellant Acadia

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, Maine 04101-2480
(207) 772-1941
mhewey@dwmlaw.com
kpark@dwmlaw.com

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,189 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using serifs in Times New Roman 14 point font.

Dated: August 22, 2022
/s/ Melissa A. Hewey
Melissa A. Hewey
First Circuit Bar No. 40774
*Attorney for Appellant Acadia*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2022, I electronically filed the Brief of Appellant Acadia Hospital Corp. with the U.S. Court of Appeals for the First Circuit by using the CM/ECF system which will send notification of such filing(s) to counsel of record. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

> David G. Webbert, Esq.
> Johnson & Webbert
> 160 Capitol Street, Suite 3
> P.O. Box 79
> Augusta, ME 04332-0079
> dwebbert@work.law
>
> Valerie Z. Wicks, Esq.
> Andrew Schmidt Law PLLC
> 97 India Street, 2nd Floor
> Portland, ME 04101
> val@maineworkerjustice.com

Dated: August 22, 2022          */s/ Melissa A. Hewey*
                               Melissa A. Hewey
                               First Circuit Bar No. 40774
                               *Attorney for Appellant Acadia*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME 04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com

# ADDENDUM OF APPELLANT/DEFENDANT
## ACADIA HOSPITAL CORPORATION

## TABLE OF CONTENTS

Order on Plaintiff's Motion for Partial Summary Judgment and Defendants'
Motion for Leave to File and Motion for Certification ....................................Add. 1

Amended Order on Damages..........................................................................Add. 23

Judgment .......................................................................................................Add. 25

Maine Department of Labor, Bureau of Labor Standards, Chapter 12, Rules
Relating to Equal Pay ....................................................................................Add. 26

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CLARE E. MUNDELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-cv-00004-LEW |
| | ) | |
| ACADIA HOSPITAL CORP. and | ) | |
| EASTERN MAINE HEALTHCARE | ) | |
| SYSTEMS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND DEFENDANTS' MOTION FOR LEAVE TO FILE
<u>AND MOTION FOR CERTIFICATION</u>**

This matter stands before the court on Plaintiff Clare Mundell's Motion for Partial Summary Judgment (ECF No. 13) against Defendant Acadia Hospital on her claim under the Maine Equal Pay Law, 26 M.R.S. § 628. Following oral argument on the Motion for Partial Summary Judgment, Defendants Acadia Hospital and Eastern Maine Healthcare Systems filed a Motion for Leave to File (ECF No. 28) a Motion for Certification of Question of State Law to the Law Court (ECF No. 28-1).

Defendants' Motion for Leave to File is granted. For reasons that follow, Defendants' Motion for Certification is denied and Plaintiff's Motion for Partial Summary Judgment is granted.

## BACKGROUND

Plaintiff Clare Mundell is a Licensed Clinical Psychologist with graduate degrees in Clinical Psychology and Social Work. Beginning in 2017, Plaintiff was employed as a pool psychologist by Acadia, a nonprofit hospital located in Bangor, Maine.[1] Acadia employed four other pool psychologists during this time, two of whom were male and two of whom, like Plaintiff, were female. Acadia paid the two male psychologists at a rate of $95 and $90 per hour, but only paid Plaintiff and the other female pool psychologists $50 per hour.

By all accounts, all five of Acadia's pool psychologists, including Plaintiff, possessed the same fundamental qualifications for the role: they all held doctoral degrees, were licensed to practice psychology in Maine, and had experience and skills in providing psychological services. All five pool psychologists performed the same functions for Acadia. Acadia did not have a seniority system or merit increase system in place for paying its employees, and the summary judgment record suggests that pool psychologist's salaries did not change over time. Acadia claims to set salaries for pool psychologists and other employees based on the fair market value of each employee's services. At least one of the

---

[1] In the Complaint, Plaintiff alleges that she was jointly employed by both Defendants. *See* Compl. ¶ 18 (ECF No. 1). Plaintiff's formal employer was Acadia, and she brings her Motion for Summary Judgment only against Acadia.

male pool psychologists negotiated his salary before starting in the position, which Acadia argues is consistent with the fair market value approach to salary setting.

When Plaintiff discovered the pay disparity between male and female pool psychologists, she brought it to the attention of higher-ups at Acadia. Around this time, Acadia independently became aware of several gender pay disparities among hospital employees and began a process to standardize pay across genders. After a series of conversations between Plaintiff and Acadia in which the parties attempted to arrive at a mutually agreeable solution, Plaintiff informed Acadia that she intended to resign due to her dissatisfaction with the gender pay disparity. Though Plaintiff intended to resign two weeks following her notice, she was terminated three days after she gave notice.

Plaintiff filed complaints for sex discrimination and retaliation with the Equal Employment Opportunity Commission and Maine Human Rights Commission and, after exhausting the administrative process, filed this action. Plaintiff alleges that Defendants violated the Maine Equal Pay Law, 26 M.R.S. § 628, by paying male and female employees different wages for comparable work; that Defendants' failure to provide equal pay amounted to gender discrimination in violation of the Maine Human Rights Act, 5 M.R.S. § 4572, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); and that Defendants committed unlawful retaliation by firing Plaintiff after she complained of what she believed to be gender-based discrimination. Plaintiff seeks declaratory and injunctive relief, liquidated damages under 26 M.R.S. § 626-A, and damages for unfairly denied

wages and other compensation. Plaintiff now moves for summary judgment on only the Maine Equal Pay Law claim against Defendant Acadia.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 247–48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in their favor. *Triangle Trading Co. v. Robroy Indus*., *Inc*., 200 F.3d 1, 2 (1st Cir. 1999).

## ANALYSIS

Under the Maine Equal Pay Law ("MEPL"), no employer may pay an employee "at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable work on jobs that have comparable requirements relating to skill, effort and responsibility." 26 M.R.S. § 628. MEPL also authorizes affirmative defenses under which an employer may escape liability by showing that any pay differences were based on

4

otherwise non-discriminatory "established seniority systems or merit increase systems or difference[s] in the shift or time of the day worked." *Id.*

The undisputed facts of this case establish the core elements of Plaintiff's pay discrimination claim. The parties agree that Acadia paid Plaintiff and other female pool psychologists less than it paid male pool psychologists; that the pool psychologists all occupied the same job and performed comparable work to one another; and that these pay differences were not due to an established seniority system, merit pay system, or shift differences. The parties' main point of disagreement is whether that alone is sufficient to establish liability under MEPL, in which case Plaintiff prevails as a matter of law, or whether Acadia must also have had a discriminatory motive, in which case this matter should proceed to trial to resolve the factual dispute. The parties also dispute whether the answer to this question should be resolved by the Maine Supreme Judicial Court (the "Law Court") through the certification process found in Rule 25 of the Maine Rules of Appellate Procedure.

### A. Defendants' Motion for Certification of a Question of Law

Acadia asks that I certify to the Law Court the issues of whether (1) MEPL liability is limited to instances in which employers expressly and consciously discriminate based on gender and (2) whether 26 M.R.S. § 626-A makes treble damages available for violations of MEPL. Mot. for Cert. (ECF No. 28-1). When faced with potentially outcome-determinative questions of Maine law for which "there is no clear controlling precedent in the decisions of the Supreme Judicial Court," a federal court may certify those questions to the Supreme Judicial Court "for instructions" on how to rule. Me. R. App. P. 25. But "a

5

federal court sitting in diversity should not simply throw up its hands" in the face of undecided state law questions. *Butler v. Balolia*, 736 F.3d 609, 612–13 (1st Cir. 2013). As the Supreme Court recently reiterated, certification on a question of state law is never "obligatory," but instead "rests in the sound discretion of the federal court." *McKesson v. Doe*, 141 S. Ct. 48, 51 (2020) (quotation omitted).

While "certification is advisable" in certain "exceptional circumstances," *id.*, "certification is inappropriate when the course that the state courts would take is reasonably clear." *Gonzalez Figueroa v. J.C. Penney Puerto Rico*, *Inc.*, 568 F.3d 313, 323 (1st Cir. 2009). Here, as will be explained below, "the plain language of the statute, legislative history and public policy, all" point in the same direction and make the correct constructions of MEPL and § 626-A sufficiently clear. *See Int'l Ass'n of Machinists & Aerospace Workers v. Verso Corp.*, 121 F. Supp. 3d 201, 227 (D. Me. 2015) (quotation omitted). Accordingly, I deny Defendants' Motion for Certification.

## B. Plaintiff's Motion for Summary Judgment

### 1.  *Application of the Maine Equal Pay Law*

As the Law Court "has not spoken directly on the question at issue," I must "predict 'how that court likely would decide the issue.'" *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011) (quoting *Gonzalez Figueroa v. J.C. Penney P.R.*, *Inc.*, 568 F.3d 313, 318-19 (1st Cir. 2009)). Of course, there is a certain fiction to this standard: rare is the case that does not present at least *some* legal question on which the relevant judicial body has not spoken "directly." Every application of state law to a new fact pattern arising in federal court necessarily entails some amount of prediction. Still, I am wary not to venture so far afield

6

as to "blaze a new trail that the [Maine] courts have not invited." *Jones v. Secord*, 684 F.3d 1, 11 (1st Cir. 2012). Instead, I interpret MEPL in light of "the relevant statutory language, analogous decisions of the [Law Court], decisions of the lower state courts, and other reliable sources of authority," *Barton*, 632 F.3d at 17, including the "interpretive methods and canons of construction" employed by Maine courts, *Coffey v. New Hampshire Jud. Ret. Plan*, 957 F.3d 45, 49 n.3 (1st Cir. 2020). Ultimately, I "assume that the state courts would adopt the rule which, in [my] view, is supported by the thrust of logic and authority." *Moores v. Greenberg*, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987) (quotation omitted).

"When interpreting a statute, [I will] give effect to the Legislature's intent by considering the statute's plain meaning and the entire statutory scheme of which the provision at issue forms a part." *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 14, 157 A.3d 223, 229 (quotation marks omitted). "Only if the plain language of the statute is ambiguous" should I "look beyond [it] "to examine other indicia of legislative intent, such as legislative history." *Id.* "Statutory language is considered ambiguous if it is *reasonably* susceptible to different interpretations." *Id.* (emphasis added).

I look first to the plain language of the statute. MEPL states, in relevant part: "An employer may not discriminate between employees . . . on the basis of sex *by* paying [unequal wages] for comparable work …." 26 M.R.S. § 628 (emphasis added).[2] This

---

[2] The entire sentence reads as follows:

> An employer may not discriminate between employees in the same establishment on the basis of sex by paying wages to any employee in any occupation in this State at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable work on jobs that have comparable requirements relating to skill, effort and responsibility.

26 M.R.S. § 628.

sentence contains two clauses connected by a preposition. The first clause states that employers may not discriminate on the basis of sex. The second clause establishes how an employer discriminates on the basis of sex for purposes of the statute: by paying unequal wages.  The syntactical sinew lashing the two clauses together is the preposition "by," which is defined as "through the means or instrumentality of," or "through the work or operation of."  *By*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 307 (1961). Thus the means through which discrimination is achieved, for the purpose of MEPL, is the payment of unequal wages for comparable work. It is irrelevant that the phrase "discriminate on the basis of sex" in other contexts may sometimes require a showing of intentional discrimination, because MEPL defines discrimination to mean any unjustified pay disparity. Likewise, if a referee at a football game were to instruct that "players may not engage in unsportsmanlike conduct by celebrating after a touchdown," it would be beside the point to argue about whether a particular celebration was unsportsmanlike—the referee removed all ambiguity by defining the conduct that is deemed unsportsmanlike. Just so here: the act of paying unequal wages for comparable work establishes discrimination on the basis of sex under the statute.

Case law interpreting the Federal Equal Pay Act ("FEPA") reinforces that this is the only reasonable interpretation of MEPL. *See Gordon v. Maine Cent. R.R.*, 657 A.2d 785, 786 (Me. 1995) (where the Law Court has not yet interpreted a statute, "Maine Courts may look to analogous federal statutes, regulations, and case law for guidance"). Though MEPL predates FEPA, the Maine legislature amended MEPL shortly after FEPA's passage to bring the laws closer in line with one another, resulting in laws that are nearly identical in

8

both text and structure. *Compare* P.L. 1965, ch. 150, § 628 *with* 29 U.S.C. § 206(d)(1). Like MEPL, FEPA states in relevant part that employers may not "discriminate . . . on the basis of sex by paying [unequal wages] for equal work." 29 U.S.C. § 206(d)(1). The US Supreme Court has interpreted this language to require only a showing "that the employer pays workers of one sex more than workers of the opposite sex for equal work." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). A "plaintiff need not show that the defendant was motivated by a discriminatory animus." *McMillan v. Massachusetts Soc. for Prevention of Cruelty To Animals*, 140 F.3d 288, 298 (1st Cir. 1998). An employer may avoid FEPA liability by establishing that it lacked a discriminatory motive, but the employer's motive only enters the equation through one of FEPA's affirmative defenses, not as an element of the plaintiff's case. *See id.*

While Maine courts construing MEPL are not bound by the federal courts' reading of the analogous language in FEPL, they would likely find it persuasive authority. Where, as here, statutory language is "obviously transplanted from another legal source . . . it brings the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947). Indeed, other state equal pay laws with similar language have been construed, like FEPA, to lack an intent requirement. *See, e.g.*, *Jancey v. Sch. Comm. of Everett*, 658 N.E.2d 162, 170 (Mass. 1995); *Vermont Hum. Rts. Comm'n v. Vermont Dep't of Corr.*, 136 A.3d 188, 196 (Vt. 2015).

That an employer's intent is irrelevant under MEPL is further reinforced by the fact that MEPL, unlike FEPA, lacks a catchall affirmative defense for pay "differential[s] based

**Add. 9**

on any other factor other than sex." 29 U.S.C. § 206(d)(1).[3] In this respect, MEPL is similar to Massachusetts' Equal Pay Law, which that state's Supreme Judicial Court has read to "create[] a form of strict liability" because the statute's "plain text" makes no reference to an employer's discriminatory motive or lack thereof. *See Jancey*, 658 N.E.2d at 170. I find its interpretation of the text of the state equal pay law viz-a-viz FEPA to be persuasive and expect that the Law Court would give effect to this significant textual difference between MEPL and FEPA. *See State v. Greenwald*, 454 A.2d 827, 830 (Me. 1982) (assuming that, where a Maine statute closely tracks a statute from another jurisdiction but omits one or more key phrases, the Legislature intended to give effect to those differences). I will not will into existence by judicial fiat a catchall affirmative defense that does not exist in the text of the law.

A review of Law Court precedent makes clear that, were that court to address the issue, it would hold that MEPL does not require a showing of discriminatory intent. Such a ruling would be in keeping with the Law Court's broader anti-discrimination jurisprudence. For example, in *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253 (Me. 1979), the Law Court relied on analogous federal precedent to hold that a claim premised on disparate impact does not require proof of the employer's discriminatory

---

[3] On the issue of defenses, MEPL is terse and to the point: "Differentials that are paid pursuant to established seniority systems or merit increase systems or difference in the shift or time of the day worked that do not discriminate on the basis of sex are not within this prohibition." 26 M.R.S. § 628.

intent. *Id.* at 1261; *see also Scamman v. Shaw's Supermarkets*, *Inc*., 2017 ME 41, 157 A.3d 223, as corrected (Mar. 23, 2017).

Though the Law Court looks to persuasive federal authority when relevant, it does so only "when the federal and state laws are substantially identical," and otherwise construes Maine discrimination laws to give effect to any differences between analogous state and federal statutes. *Scamman*, 2017 ME 41, ¶ 26, 157 A.3d 223. In *Scamman*, the Law Court declined to adopt the employer-favorable standard that governs federal age-based discrimination claim—the "reasonable factor other than age" standard found in the federal Age Discrimination in Employment Act—because even though the MHRA was ambiguous on the issue of the appropriate legal standard, the MHRA's language did not support the application of a different standard in age discrimination cases than in other discrimination cases under the MHRA. *See* 2017 ME 41, ¶ 22, 157 A.3d 223, 231 ("This history suggests that the Legislature has chosen—intentionally—not to limit the scope of its protections against age discrimination by providing for an RFOA defense.").

The interpretive parallels between *Scamman* and this case are apparent. But there is one important difference. *Scamman* presented an interpretive issue arising from the MHRA's lack of a statutorily-prescribed standard for age discrimination, an ambiguity which might have been resolved by reference to analogous federal law. MEPL, on the other hand, contains no such ambiguity—as discuss above, the Legislature clearly defined what conduct was banned under MEPL and spelled out the available defenses, while withholding the more employer-friendly catchall defense found in FEPA. Thus in this case,

11

even more so than in *Scamman*, the Law Court's interpretive approach demands that I effectuate the differences between MEPL and FEPA.

For the foregoing reasons, Acadia's argument that ambiguity exists in the text of MEPL because the Legislature used the phrase "discriminate . . . on the basis of sex" is a nonstarter. The Maine and federal precedents outlined above reflect that the word discriminate does not automatically imply the existence of discriminatory intent. This basic understanding of anti-discrimination law has been on the books for 50 years. *See Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("Proof of discriminatory motive, we have held, is not required under a disparate-impact theory."); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422 (1975) ("Title VII is not [exclusively] concerned with the employer's good intent or absence of discriminatory intent for Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." (quotation marks omitted)); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) ("practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices"). Not only is there no inherent expectation in the law that the prohibition against discrimination applies only to intentional discrimination, but also no indication in the text of MEPL that it is at all concerned with proof of discriminatory intent. Thus, even if there were some latent ambiguity to resolve here—because discrimination claims require proof of discriminatory intent in cases involving disparate *treatment*—the backdrop provided by Maine law, Law Court precedent addressed to disparate impact scenarios, and federal law addressed to disparate impact scenarios militate in favor of the

12

understanding that it is illogical to impose an intent requirement in a wage discrimination scenario. The evil redressed by MEPL is decidedly the impact of unequal pay for comparable work, regardless of the employer's motivation.[4]  Indeed, in the context of Maine wage law there is no precedent to suggest that non-payment or under-payment of wages could ever be excused by the employer's demonstration of a lack of intent to violate the law.

Finally, even if I were to search the depths of legislative intent as revealed in MEPL's legislative history, that history only reinforces the plain language construction I have been discussing. MEPL predates FEPA, and in its initial form, MEPL contained a catchall defense permitting pay differences based on "any reasonable differentiation except difference in sex." P.L. 1949, ch. 262, § 40-A. When the Legislature revised MEPL's wording two years after FEPA's passage, it removed this catchall defense. *See* P.L. 1965, ch. 150, § 628. At the same time, the Legislature ensured that two of the remaining affirmative defenses in MEPL were worded similarly to analogous affirmative defenses under the federal statute. *Compare* P.L. 1965, ch. 150, § 628 (excepting differences paid "pursuant to *established seniority systems* or *merit increase systems* or difference in the shift or time of the day worked") (emphasis added) *with* Equal Pay Act of 1963, Pub. L. No. 88-38, § 3, 77 Stat. 56, 57 (1963) (excluding differences paid "pursuant to (i) *a seniority system*; (ii) *a merit system*; (iii) a system which measures earnings by quantity or

---

[4] Acadia's purported defense, that male clinical psychologists were paid a negotiated fair market value, whereas female clinical psychologists were paid some sort of survey-based fair market value, ironically only reinforces Plaintiff's case.

quality of production; or (iv) a differential based on any other factor other than sex")
(emphasis added). That the Legislature declined to include a catchall defense in this
amended version of the law while borrowing other affirmative defenses from FEPA—and
in fact removed a catchall defense that had previously existed under MEPL—evinces a
design to ensure that the state law protected pay equality regardless of the employer's non-
discriminatory motive.[5] *Cf. City of Auburn*, 408 A.2d at 1261 (noting presumption that the
Legislature legislates "against the background of prior federal antidiscrimination statutes").
Moreover, the fact that MEPL was drawn against a legal backdrop that elsewhere
prohibited purposeful discrimination on the basis of sex reassures that the Legislature
meant to do away with that requirement in the specific context of pay disparity. Legislative
intent is expressed in the law as written, for all to see. Typically, a romp through the minds
of lawmakers is not the business of this Court when engaged in statutory construction; but
to the extent that it is possible or appropriate for a court to divine any Legislative "intent"
other than  that which is expressed through the words of the law, all available indicia show
that with MEPL, the Legislature said what it meant and meant what it said.

Nor does a plain text reading of MEPL lead to absurd results. While MEPL lacks
an intent requirement, the law leaves ample room for legitimate compensation differences
that happen to result in pay disparities between men and women. MEPL only applies where
employees perform "comparable work on jobs that have comparable requirements relating

---

[5] At the same time that the Legislature made these amendments to MEPL, it also revised MEPL's
requirement of "equal" work—the same requirement as under FEPA—to a more capacious requirement of
"comparable" work, further indicating an intent to ensure a more ambitious state law than its federal
counterpart. *See* P.L. 1965, ch. 150, § 628.

to skill, effort and responsibility," and even then creates affirmative defenses for pay differentials based on seniority, merit, and differences in shift or time of day. 26 M.R.S. § 628. Employers retain the ability to consider the broad spectrum of factors informing differences in compensation without running afoul of the statute. I acknowledge that my interpretation of MEPL will require employers to track compensation differentials among their employees and to articulate one of the authorized reasons provided by the statute for such pay disparity. This hardly impresses me as an absurd result of a pay equality statute. To the contrary, it strikes me as reasonable that the Legislature would impose the burden of knowledge of employee pay on the employers who do the paying rather than place employees in the untenable position to ferret out what their colleagues of the opposite sex are paid.

Construing MEPL thus, I conclude that Acadia has violated the statute as a matter of law, given the undisputed facts of record.

## 2. *Preemption*

Lacking a viable defense under MEPL's limited affirmative defense categories, Acadia attempts to invalidate MEPL with a perplexing preemption play. Acadia argues that MEPL does not apply in this case because it is preempted by various federal anti-fraud laws that govern billing for medical providers. According to Acadia, requiring hospitals to pay their female employees as much as their male employees doing comparable work would undermine the flexibility needed to tailor hospital employees' compensation in line with the complex regulatory regime governing payment for medical services created by

15

laws such as the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral Law, 42 U.S.C. 1395nn, and the False Claims Act, 31 U.S.C. §§ 3729.

But federal anti-fraud laws do not preempt MEPL.[6] Under the Supremacy Clause of the U.S. Constitution, Congress may pass legislation that preempts otherwise valid state laws. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). Precedents recognize "three different types of preemption—conflict, express, and field." *Id.* at 1480 (cleaned up). Neither express nor field preemption applies here—none of the federal anti-fraud statutes that Acadia cites expressly prohibit the enactment of equal pay laws, nor do any of the federal statutes completely occupy the field of medical wages in a manner that leaves no room for state legislation. *See id.* And while Acadia hangs its hat on a theory of conflict preemption, that theory is equally unavailing. Conflict preemption applies "where it is impossible for a private party to comply with both state and federal law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Here, neither obtains.

This is not a situation where compliance with both federal and state law is impossible—Acadia, like other employers in Maine, can comply with the requirements of both MEPL and federal anti-fraud laws. MEPL simply requires that employers provide

---

[6] In any event, Acadia waived its preemption defense by failing to raise it in the answer, as required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(c). Because an argument regarding preemption would bar recovery "even if the general complaint were more or less admitted to," preemption is an affirmative defense and so generally must be raised in the defendants' responsive pleading. *Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 449 (1st Cir. 1995).

equal pay to male and female employees who perform comparable work unless such pay disparity is authorized under the statute. 26 M.R.S. § 628. And it is plainly possible to pay women as much as men while, for example, avoiding the exchange of kickbacks or bribes, *see* 42 U.S.C. § 1320a-7b; avoiding self-referral by physicians, *see* 42 U.S.C. § 1395nn; and avoiding making false or fraudulent claims for payment, *see* 31 U.S.C. § 3729(a)(1)(A). It is also possible to pay women as much as men while ensuring that each employee's compensation reflects the fair market value of his or her services—indeed, providing comparable pay for comparable work is an essential element of any fair, "arm's length," market-based compensation structure. *See* 42 C.F.R. § 1001.952(d)(v). Milton Friedman will not roll over in his grave if Maine employers must abide MEPL in this fashion.

Nor is it the case that applying MEPL to large hospitals such as Acadia would pose an "obstacle" to achieving the purposes of federal anti-fraud laws. Acadia chiefly argues that adding another layer of regulation to an already-complex federal scheme would frustrate the balance struck by federal regulators. It cannot come as a surprise to Acadia that federal and state laws often combine to impose a complex and heavy regulatory burden. But that does not amount to preemption. And it is hard to see how, "under the circumstances of [this] particular case," MEPL "stands as an obstacle" to effectuating the purpose of anti-fraud laws. *Crosby*, 530 U.S. at 373 (quoting *Hines*, 312 U.S. at 67). Congress' apparent purpose in passing the Anti-Kickback Statute and Physician Self-Referral Law was to prevent fraud and waste in Medicare spending and other healthcare costs; Congress' purpose in passing the False Claims Act was more generally to prevent

17

fraud and ensure efficient government spending. Nothing in any of these federal laws evinces an intent to displace state wage laws. And while it is conceivable that *some* state wage law could lead to inefficient—though not fraudulent—healthcare spending, providing equal pay for equal work is decidedly not inefficient. Absent a credible showing that MEPL actually stands in the way of preventing wasteful or fraudulent healthcare spending, Acadia is left arguing that compliance with MEPL on top of anti-fraud laws would be too burdensome; but it is the role of state and federal legislators, not the unelected federal judiciary, to sort out that political argument.

Similarly, the fact that compliance with MEPL may make it difficult for Acadia to enjoy the protection of various federal statutory and regulatory safe harbors for "fair market" pay, *see, e.g.*, 42 U.S.C. § 1395nn(e)(2)(B)(i), does not mean that it is impossible or even difficult for Acadia to comply with both federal and state law. The safe harbors that Acadia cites are just that—legal carveouts that provide regulated entities with the knowledge that certain pre-approved billing practices will not open them up to a risk of litigation. Engaging in conduct that falls beyond a safe harbor does not necessarily amount to a violation of federal law. In some cases, courts have found preemption where state laws expressly sought to impose liability for conduct that federal law protected via safe harbor provisions. *See, e.g.*, *State v. Harden*, 938 So. 2d 480, 493 (Fla. 2006) (federal Anti-Kickback Statute preempted state analogue where state law did not recognize statutory safe harbors). But MEPL does not proscribe setting compensation based on "fair market value," 42 U.S.C. § 1395nn(e)(2)(B)(i)—to the contrary, it requires that the market value all

employees fairly, which naturally may lead to pay disparity if the basis for the disparity is authorized under the statute.

Acadia's attempt to set aside state wage protections in the name of market dynamics amounts to no more than statutory Lochnerism. MEPL is not preempted by any of the federal anti-fraud laws that Acadia cites.

### 3. *Availability of Treble Damages*

Because the record conclusively demonstrates that Acadia violated Plaintiff's rights under MEPL and because MEPL is not preempted by federal law, a legal issue of remedy arises.  For reasons that follow, I conclude that Plaintiff is entitled to treble damages for her lost wages under 26 M.R.S. § 626-A.

Section 626-A sets out the penalties for violations of MEPL and certain other enumerated provisions of Maine's wage laws. Section 626-A authorizes two possible penalties: "forfeiture of not less than $100 nor more than $500 for each violation," and treble damages for any "unpaid wages or health benefits adjudged to be due." 26 M.R.S. § 626-A. On the statute's face, only the forfeiture clause obviously applies to violations of MEPL. However, the Law Court has held that the treble damages clause also applies to violations of any law listed in § 626-A to the extent that the employer is liable for "unpaid wages," because removing the possibility of treble damages "would strip" Maine's wage laws "of their effectiveness," *Cooper v. Springfield Terminal Ry. Co.*, 635 A.2d 952, 955 (Me. 1993). The Law Court has further clarified that the term "unpaid wages" includes instances where the employee was shorted—that is, not "paid in full"—as well as instances where the employee was stiffed altogether. *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16,

19

759 A.2d 217. Thus while I am aware of no Maine court that has awarded treble damages for a violation of MEPL—presumably because MEPL has sparked precious few cases litigated to judgment—it is a natural entailment of Law Court precedent that Acadia is liable for treble damages based on the measure of wages Plaintiff was not paid but was legally entitled to under MEPL.

Relying on the Law Court's opinion in *In re Wage Payment Litigation*, Acadia argues that the amount owed to Plaintiff under MEPL is not an "unpaid wage," because Plaintiff has been paid. To start, section 626-A's grammar belies Acadia's argument—the statute authorizes treble damages for "unpaid wages," not "unpaid employees." 26 M.R.S. § 626-A. What's more, *In re Wage Payment Litigation* stands for a narrower proposition than Acadia suggests. That case involved a dispute over late wages, which the Law Court held did not classify as "unpaid" so long as any late wages were paid (1) upon the employee's demand, if the employee had already been terminated, or (2) by the next pay period, for current employees. *In re Wage Payment Litigation*, 2000 ME 162, ¶ 15, 759 A.2d 217. Because the wages owing to the employees in that case were eventually "paid in full," *id.* ¶ 16, they were not "unpaid." By contrast, Plaintiff has shown that, under MEPL, she was not "paid in full" during her time with Acadia; thus applying the Law Court's reasoning in *In re Wage Payment Litigation*, Plaintiff is owed unpaid wages under section 626-A.

Acadia contends that the Legislature cannot have intended the "absurd" result of imposing potentially massive liability on employers who, for years or even decades, paid female employees less than male employees without the employees' knowledge. But that

20

result is neither absurd nor inconsistent with the Legislature's aims. The purpose of section 626-A's treble damages provision is to provide effective deterrence against violations of Maine's wage laws. *See* L.D. 991, Statement of Fact (107th Legis. 1975). Underpayment of employees is notoriously hard to identify, thus absent the threat of significant liability, some employers would choose to undercompensate their employees and simply pay back the difference on the chance that they got caught. *See id.* (creating a "greater deterrent" for violations of wage laws because "[t]he penalty for failure to pay wages or earned vacation pay is too small to provide a deterrent to the employer who refuses or delays payment"). The record suggests that this is precisely the case with MEPL. Plaintiff, like many employees, was unaware of her colleagues' compensation for years. That Acadia avers to having been unaware of this difference only highlights why the Legislature chose to authorize treble damages under section 626-A and to apply that provision to MEPL. Absent the threat of heightened liability, employers would be incentivized not to investigate their compensation practices for MEPL compliance, knowing that they could simply pay back the difference if they were ever caught. And while employers' potential liability under section 626-A is certainly high, it is consistent with the scope of liability under the Maine Department of Labor's rules implementing MEPL insofar as those rules authorize both "civil enforcement action" by the Attorney General and "class-wide relief" for MEPL violations. 12-170 C.M.R. ch. 12, §§ III. Nor does it offend due process to impose treble damages for violations of a law that, like section 628, lacks an intent requirement. *See*

21

*Bisbing v. Maine Med. Ctr.*, 2003 ME 49, ¶ 7, 820 A.2d 582 (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 581–84 (1942)).

Accordingly, I conclude that section 626-A entitles Plaintiff to "unpaid wages" for the time that she was unlawfully underpaid by Acadia, plus "a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages." 26 M.R.S. § 626-A. Because neither party has provided facts to establish the amount of unpaid wages owing to Plaintiff, the proper measure of damages requires further proceedings.

## CONCLUSION

Defendants' Motion for Leave to File (ECF No. 28) is GRANTED. Defendants' Motion for Certification of Question of Law (ECF No. 28-1) is DENIED. Plaintiff's Motion for Partial Summary Judgment (ECF No. 13) is GRANTED.   Summary judgment will enter in favor of Plaintiff and against Defendant Acadia Hospital, Corp. on Count I of Plaintiff's Complaint.

**SO ORDERED.**

**Dated this 8th day of February, 2022.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CLARE E. MUNDELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-00004-LEW |
| | ) | |
| ACADIA HOSPITAL CORP. and | ) | |
| EASTERN MAINE HEALTHCARE | ) | |
| SYSTEMS, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>AMENDED ORDER ON DAMAGES</u>**

On February 8, 2022, I granted summary judgment to Plaintiff on her claim of gender-based pay discrimination in violation of the Maine Equal Pay Law, 26 M.R.S. § 628. In my order, I held that Plaintiff was entitled to "unpaid wages" for the time that she was unlawfully underpaid by Defendant Acadia Hospital Corp. ("Acadia"), plus "a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages." 26 M.R.S. § 626-A. However, I withheld a final determination of damages because neither party had provided facts to establish the amount of unpaid wages owing to Plaintiff.

Plaintiff now requests damages in the amount of $180,955.90. *See* Pl's Mot. (ECF No. 42). The parties have jointly stipulated that Plaintiff "worked a total of 1,447.9 hours for Acadia" while being underpaid at a rate of approximately $40 per hour. *See* Stipulation on Remedies 2 (ECF No. 41). This amounts to $57,916 in unpaid wages, and $115,832 in

**Add. 23**

liquidated damages. I also find that Plaintiff's requested interest of $7,207.90 is "reasonable" as called for by the Maine Equal Pay Law. Acadia does not object to Plaintiff's requested award, and instead reasserts the legal arguments that I rejected in my Order granting Plaintiff's Motion for Summary Judgment.[1] *See* Def.'s Opp'n (ECF No. 43).

Accordingly, Plaintiff's Motion for Order on Damages (ECF No. 42) is GRANTED, and Acadia is ordered to pay damages to Plaintiff in the amount of $180,955.90.

**SO ORDERED.**

Dated this 10th day of May, 2022.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

---

[1] While not convinced that an appeals court would deem Acadia to have abandoned its merits arguments based on the language in my prior damages order, I issue this corrected order to assuage Acadia's anxiety and make clear that Acadia has preserved all of the legal arguments advanced in opposition to Plaintiff's Motion for Summary Judgment.

2

**Add. 24**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


CLARE E. MUNDELL                      )
Plaintiff,                           )
                                     )
v.                                   )      Civil No. 1:21-cv-00004-LEW
                                     )
ACADIA HOSPITAL CORP. and            )
EASTERN MAINE HEALTHCARE             )
SYSTEMS                              )
Defendants,                          )


<u>JUDGMENT</u>


Pursuant to the Order on Plaintiff's Motion for Partial Summary Judgment and

Defendant's Motion for Leave to File and Motion for Clarification entered by U.S. District Judge

Lance E. Walker on February 8, 2022, the Amended Order on Damages entered by U.S.

District Judge Lance E. Walker on May 10, 2022, and the Joint Stipulation of Dismissal filed on

May 11, 2022,

JUDGMENT is hereby entered for Plaintiff, Clare E. Mundell and against Defendant,

Acadia Hospital Corp. in the amount of $180,955.90 on Count I; and

JUDGMENT of Dismissal is hereby entered as to Acadia Hospital Corp. on Counts II

and III of the Complaint and against Eastern Maine Healthcare Systems on Counts I, II and III

of the Complaint.


                                     CHRISTA K. BERRY
                                     CLERK


Dated: May 12, 2022                  By: <u>/s/ Meghan Maker</u>
                                     Deputy Clerk

**Add. 25**

12          DEPARTMENT OF LABOR

170         BUREAU OF LABOR STANDARDS

Chapter 12:     RULES RELATING TO EQUAL PAY

---

I.      Definitions.

As used in this chapter and in interpreting 26 MRSA §628, unless the context clearly requires otherwise, the following terms have the following meanings:

A.      "Aggrieved party" means any individual, group, or organization, including current or former employees, or a labor union, who has been injured, or whose members have been injured, by a practice alleged to violate 26 MRSA §628 and these rules.

B.      "Bureau" means the Department of Labor, Bureau of Labor Standards.

C.      "Director" means the Director of the Bureau of Labor Standards.

D.      "Effort" means the physical or mental exertion required for the performance of a job. Effort encompasses the total requirements of a job. Working conditions must be considered in making a determination of the degree of effort necessary to do a job to the extent reasonable and necessary.

E.      "Employee" means every person who may be permitted, required, or directed by any employer to engage in any employment in consideration of direct or indirect gain or profit.

F.      "Employer" means an individual, partnership, association, corporation, legal representative, political subdivision of the State, trustee, receiver, trustee in bankruptcy, and any express company or common carrier by rail, motor, water, or air doing business or operating within the State.

G.      "Establishment" means an industrial or commercial facility or place of business. An entity operated by the same employer shall be considered a single establishment for purpose of this chapter even though it may operate at different physical locations, where employees at these separate locations are engaged in functionally similar operations and there is a substantial degree of central authority for establishing personnel rules and approving wage rates.

H.      "Job classification" means one or more positions sufficiently similar with respect to duties and responsibilities so that the same descriptive title may be used with clarity to designate each position allocated to the class; the same general

qualifications are needed for performance of the duties of the class; the same tests of fitness may be used to recruit employees; and the same schedule of pay can be applied with equity to all positions in the classification under the same or substantially the same employment conditions.

I.      "Merit increase system" means an established, bona fide, uniform, and objective system which rewards an employee with promotion, pay increases, or other advantages on the basis of competence.

J.      "Responsibility" means the degree of accountability and reliability required in the performance of a job, with emphasis on the importance of the job obligation, including but not limited to, coordination of information, organization, and the well being of individuals.

K.      "Seniority system" means a system that gives preference to workers based on years of service. For example, a worker with more years of service may be paid more for performing a particular job than an employee with fewer years of service in that same job.

L.      "Skill" means the performance requirements of the job including, but not limited to, such factors as experience, training, education, ability, human relations, and communication. In reviewing the skill level of a position class, the efficiency of any individual employee's performance in the job is not, in itself, a factor in evaluating skill.

M.      "Wages" means all payments made to or on behalf of an employee as remuneration for employment. The term wages includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, or profit sharing. An expense account, monthly minimum, bonus, uniform cleaning allowance, board or lodging, use of company car, gasoline allowance, vacation and holiday pay and premium pay for work on weekends, holidays or other days, or hours in excess or outside of the employee's regular days or hours of work are also considered remuneration for employment under this chapter.

II.     Equal Pay for Jobs with Comparable Requirements.

A.      An employer shall not discriminate between employees within the same establishment on the basis of gender by paying wages to any employee in any occupation at a rate less than the rate paid to an employee of the opposite gender for comparable work on jobs with comparable requirements related to skill, effort, and responsibility.

B.    Nothing in subsection A shall prohibit the payment of different wages to employees where such payment is made pursuant to any of the following:

1.    A seniority system;

2.    A merit increase system; or

3.    A difference in the shift or time of day worked.

Nonetheless, the preceding systems or circumstances must not be found to discriminate on the basis of gender.

III.    Complaint Process

A.    Any aggrieved party who believes that he or she has been discriminated against in violation of 26 MRSA §628 may file a complaint with the Bureau of Labor Standards. The Bureau must provide the aggrieved party with a complaint form on which the aggrieved party shall state in writing the facts upon which the complaint is based and the harm suffered. The aggrieved party stating that the facts presented are true to the best of her or his knowledge must sign this form. The form should be sent to the Bureau's Wage and Hour Division. [Note: the address of the Wage and Hour Division is 45 State House Station, Augusta, ME 04333-0045.]

B.    If the Bureau determines that the facts provided by the aggrieved party do not state a claim upon which relief can be granted under this chapter, it may dismiss the complaint but must keep confidential the name of the aggrieved party and employer involved. Written notice of any such dismissal must be given to the aggrieved party. The notice must also advise the aggrieved party of his or her right to bring a civil action under 26 MRSA §628, how such action may be brought, the deadlines for filing such action, and any available attorney fees, should the aggrieved party prevail. The Bureau will not pursue an investigation following such dismissal unless new evidence is presented which, on review, supports the merits of the claim. The Bureau will not accept a new case nor reopen a previously reviewed case that is the subject of a civil action.

C.    As soon as practicable, the Bureau must, except in those complaints dismissed under subsection B, provide written notice to the employer against whom allegations have been made that a complaint has been filed, along with such information as is reasonably sufficient for the employer to understand and respond to the complaint. Where an aggrieved party requests confidentiality, the Bureau must make every effort to prevent the identity of the aggrieved party from becoming known to the employer except when doing so might compromise the Bureau's ability to conduct its investigation. In such cases, the Bureau will advise the aggrieved party of its need to reveal his or her identity and, thereafter, allow

that party an opportunity to withdraw the complaint before notification is given to the employer.

D.    With respect to all complaints, except those dismissed under subsection B, the Bureau must conduct an investigation and determine if reasonable cause exists to believe that discrimination has occurred in violation of this chapter. The investigation shall include a request that the employer respond to the complaint, a review of the employer's self-evaluation, if any, including a determination of whether the self-evaluation meets the requirements of this chapter, and any relevant wage and personnel information. The investigation may include the examination of evidence probative of unlawful wage differentials such as a showing of pay differentials between employees with comparable skill, effort, and responsibility; and/or a showing that jobs within the employer's workforce are segregated by gender. As part of the investigation, the Bureau may hold fact-finding hearings as it deems necessary. Such hearings will be limited in scope to those issues which the Bureau believes to be in question. The Bureau has the right to subpoena the records of the employer and to interview witnesses under oath in the same manner as provided for under the Maine Administrative Procedure Act (5 MRSA §8001 *et seq.*). The hearings may include an opportunity for both sides to present evidence and witnesses. If a party presents witnesses, a cross-examination will be allowed. Any follow up examination, if allowed, will be solely at the discretion of the hearing officer.

E.    In the course of any investigation pursuant to this chapter, the Bureau will consider as confidential any and all information received, and may not divulge such information except as allowed in 26 MRSA §3. Unless the parties agree otherwise, any negotiated settlement will be confidential.

F.    At the conclusion of its investigation, the Bureau must make one of the following findings:

1.    Reasonable Cause found. If the Bureau determines that there is reasonable cause to believe that discrimination has occurred under this chapter it may:

a.    Seek a voluntary compliance agreement signed by the employer that eliminates the unlawful practice and provides appropriate relief to the aggrieved party; or

b.    Refer the complaint to the Attorney General, informing the Attorney General of the relevant facts and recommending the commencement of a civil enforcement action.

2.    No Reasonable Cause found. If the Bureau determines that there is no reasonable cause to believe that discrimination has occurred under this chapter the complaint will be dismissed.

Whenever a determination is made under this subsection, a written notice must be provided to the parties stating the action taken, the findings of fact, and the conclusions of law supporting that action. The notice must also advise the aggrieved party of his or her right to bring a civil action under 26 MRSA §628, how such action may be brought, the deadlines for filing such action, and any available attorney fees should the aggrieved party prevail.

G.    Prior to the issuance of a reasonable cause determination made under subsection F, the parties may settle the complaint on mutually agreeable terms. Such an agreement will not affect the processing of a complaint made by any other aggrieved party, the allegations of which are like or related to the individual allegations settled.

Nothing in this subsection prevents the parties and the Bureau from agreeing to class-wide relief, provided that the Bureau determines that:

1.    The aggrieved party is an adequate representative of the class; and

2.    The proposed settlement fairly compensates the class as a whole and remedies the discrimination.

All members of the class must be notified in advance of, and be given an opportunity to comment on, the proposed settlement. Any member may withdraw from the class and continue to pursue relief in a private action.

H.    Any person affected by a determination of the Director may appeal that determination to the Commissioner of Labor by filing a written notice with the Commissioner stating the specific grounds of that person's objection within 15 working days from the issuance of the determination. After the 15 working days the determination is a final agency action.

IV.    Presumption of Compliance.

A.    Where an employer, charged under this chapter with unlawful discrimination, has completed a self evaluation which meets the standards set forth in Section V and can also make an affirmative showing that progress is being made towards removing or preventing wage differentials based on gender, in accordance with that evaluation, including implementing any required remediation plan, the Bureau will then presume that the employer has not engaged in gender discrimination in violation of this chapter.

B.    In such cases, the Bureau must give the aggrieved party an opportunity to rebut this presumption through evidence which reasonably demonstrates that,

**Add. 30**

notwithstanding the employer's self-evaluation, the employer has violated this chapter. In meeting the burden of overcoming this presumption the aggrieved party may provide all relevant information including, but not limited to, evidence that:

1.      The employer's job analysis devalues attributes associated with jobs occupied predominantly by members of one gender and/or over-values attributes associated with jobs occupied predominantly by members of the other gender;

2.      Notwithstanding non-discriminatory basic pay rates, periodic raises, bonuses, incentive payments, or other forms of remuneration differ between jobs occupied predominantly by members of one gender; or

3.      The job the aggrieved party occupies was not adequately evaluated.

4.      A job evaluation process has been completed and, if necessary, a remediation process is in progress or has been completed, but the self-evaluation has not been reviewed and updated at reasonable intervals to adjust for changes in the work environment over time.

C.      An employer wishing to avail themselves of this presumption must produce documentation describing the self-evaluation process in the detail necessary to show that they have met the standards under Section V, subsection A.

V.      Employer Self-Evaluation.

A.      In order to be eligible for the presumption of compliance in accordance with Section IV, the self-evaluation must:

1.      Clearly define the establishment in accordance with Section I, subsection G;

2.      Analyze the employee population to identify possible areas of pay discrimination;

3.      Establish a job evaluation plan as a means of determining the value of jobs within the establishment. The plan must:

a.      Be free of any gender bias;

b.      Allow for the comparison of all jobs; and

c.      Fully and accurately measure the skill, effort, and responsibility of each job based on the actual work performance requirements of the jobs evaluated;

**Add. 31**

4.      Apply the job evaluation plan to all or a significant sample of jobs, focusing on those that are predominately occupied by one gender;

5.      Create a job classification structure where jobs of equal value are placed in the same level or grouping;

6.      Determine the base pay differential between jobs that are predominately occupied by one gender to those predominately occupied by the other gender, in order to identify any wage rate discrimination; and

7.      Remedy any base pay differential identified in subsection 6. In order to meet this standard, such remediation may not reduce the pay of any employee or class of employees.

B.      The presumption of compliance may be strengthened where, throughout the self-evaluation, including any needed remediation, the employer maintains communication with and keeps employees apprised of the established process. The method and procedure for that communication may vary according to the size and organizational structure of the establishment. However, any method or procedure chosen should be adequate to reach all employees at the establishment.

STATUTORY AUTHORITY: 26 M.R.S.A. §42 and 1997 Resolves c.43

EFFECTIVE DATE:
        November 19, 2001